**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| EDWARD TUFFLY, AKA Bud Tuffly, *Plaintiff-Appellant*, | No. 16-15342 |
| | D.C. No. 2:15-cv-00067-ROS |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *Defendant-Appellee.* | OPINION |

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, Senior District Judge, Presiding

Argued and Submitted June 5, 2017
Pasadena, California

Filed September 13, 2017

Before: Sidney R. Thomas, Chief Judge, Stephen
Reinhardt, Circuit Judge, and Edward R. Korman,[*]
District Judge.

Opinion by Judge Reinhardt

---

[*] The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

## SUMMARY[**]

### Freedom of Information Act

The panel affirmed the district court's summary judgment in favor of the United States, and the district court's finding that the government had properly withheld former detainees' names under Freedom of Information Act ("FOIA") Exemption 7(C).

Edward Tuffly, the treasurer of the National Border Patrol Council, the union for Border Patrol agents, sought to compel under FOIA the disclosure of the names of 149 non-citizens who were released from detention pending a final determination whether they will be removed.

The panel held that the released detainees had a substantial privacy interest that outweighed the public interest in the disclosure of their names. Specifically, the panel held that so long as the disclosure of the information would give rise to a potential, nontrivial invasion of personal privacy, there was a privacy interest to be balanced against the public interest under FOIA Exemption 7(c). In weighing the public interest versus the privacy interest, the panel held that the privacy interests in this case were particularly strong, both because of the context of immigration enforcement and because of the private information already disclosed by the government that would be linked to the names of the released individuals; and the public interest in evaluating the effects of

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

government actions would be advanced only minimally by information that Tuffly sought.

## COUNSEL

Michael Bekesha (argued) and James F. Peterson, Judicial Watch Inc., Washington, D.C., for Plaintiff-Appellant.

Robert D. Kamenshine (argued) and Matthew Collette, Appellate Staff; John S. Leonardo, United States Attorney; Civil Division, United States Department of Justice, Washington, D.C.; for Defendant-Appellee.

## OPINION

REINHARDT, Circuit Judge:

Edward "Bud" Tuffly, the treasurer of the National Border Patrol Council, the union for Border Patrol agents, seeks to compel, under the Freedom of Information Act, the disclosure of the names of 149 non-citizens who were released from detention pending a final determination whether they will be removed—names that could be linked to other personal information that has already been released. In opposing release of the names, the government invoked FOIA's personal privacy exemptions, finding that the former detainees had a privacy interest in the non-disclosure of their names, and that Tuffly did not assert a countervailing public interest. Tuffly disagreed, and filed suit in the district court. On summary judgment, the district court found that the government had properly withheld the former detainees' names under FOIA Exemption 7(C). Tuffly, represented by

Judicial Watch, appealed. We hold that the released detainees have a substantial privacy interest that outweighs the public interest in the disclosure of their names, and affirm.

I.

In February 2013, the Department of Homeland Security (DHS) announced that, due to "fiscal uncertainty," it was releasing from detention a number of non-citizens who were in removal proceedings. The Department issued a statement reading:

> As fiscal uncertainty remains over the continuing resolution and possible sequestration, ICE has reviewed its detained population to ensure detention levels stay within ICE's current budget. Over the last week, ICE has reviewed several hundred cases and placed these individuals on methods of supervision less costly than detention. All of these individuals remain in removal proceedings. Priority for detention remains on serious criminal offenders and other individuals who pose a significant threat to public safety.

The Department also stated that "[t]he detainees who've been released can be characterized as non-criminals and other low risk offenders who do not have serious criminal histories that would subject them to mandatory detention. Detainees with serious criminal histories are a detention priority and have not been released."

Following the announcement by DHS, *USA Today* filed a FOIA request asking for information about the detainees released pursuant to the new policy. In response, the government provided records demonstrating that two-thirds of the 2,200 individuals who were released had no criminal records. The records also showed, however, that several of the released detainees had been charged with more serious crimes, including kidnapping and homicide, although they did not indicate whether any of them had actually been convicted. The records also did not disclose the former detainees' names or other identifying information. In October 2014, *USA Today* published an article discussing the information contained in the released records.[1]

The next month, inspired by the publication of the *USA Today* article, Tuffly filed a FOIA request with ICE.[2] Tuffly sought the "[r]ecords sufficient to identify all ICE detainees released in late February or early March 2013" from five Arizona detention facilities. Tuffly also requested records sufficient to identify the date of each detainee's release, his criminal history or criminal charges at the time of release, the methods of supervision to which he was subjected, and information about whether the detainee appeared for subsequent removal proceedings or was removed from the United States. In his FOIA request, Tuffly stated that this information would "enable [him], other members of the

---

[1] Immigration and Customs Enforcement (ICE) stated that the "releases involving individuals with more significant criminal histories were, by and large, dictated by special circumstances outside of the agency's control."

[2] ICE is a subdivision of DHS. Each is frequently referred to throughout this opinion as the "government."

public and the media to investigate public records pertaining to the detainees' prior convictions and arrests and potentially shed light on ICE's decision to release these detainees." Tuffly also asserted that the disclosure would "shed light on the risk to the public posed by the detainees' release and ICE's performance of its duties and responsibilities."[3]

DHS complied with Tuffly's request, but redacted the names, file numbers, and case identification numbers of the 149 released detainees identified in the records. In doing so, the agency invoked FOIA Exemptions 6 and 7(C), which permit the government to withhold personnel or law enforcement files that implicate personal privacy.[4]   The government explained that in applying the exemptions, it had "considered the privacy interests of the aliens in remaining free from embarrassment, humiliation, annoyance, harassment, intimidation, un-official questioning, retaliation or physical harm for having been detained in a detention facility." Moreover, the government stated that Tuffly "failed

---

[3] It is not clear what particular interest the treasurer of the union of Border Patrol agents had in the government's decision to release certain individuals in the process of removal proceedings. Although we find Tuffly's assertion of the public interest somewhat odd, in the end the question is irrelevant, as our analysis of withholding under Exemption 7(C) "cannot turn on the purposes for which the request for information is made." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 771 (1989).

[4] As required, the government also submitted an affidavit "identifying the documents withheld, the FOIA exemptions claimed, and a particularized explanation of why each document falls within the claimed exemption." *Lion Raisins v. U.S. Dep't of Agric.*, 354 F.3d 1072, 1082 (9th Cir. 2004), *overruled on other grounds by Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987 (9th Cir. 2016) (en banc). On appeal, Tuffly does not challenge the sufficiency of this affidavit.

to articulate any public interest that could be advanced by releasing the [personal] information," and that "the redaction was limited to the name[s] of the individual[s] or other personally identifiable information which, if released, would not shed light on the operations or activities of ICE."

In January 2015, Tuffly filed a lawsuit in the district court, seeking the release of the names of the 149 individuals. The district court found that releasing their names "would constitute a significant invasion of privacy." The court then concluded that Tuffly failed to demonstrate that the public interest in obtaining the names outweighed the privacy interests at stake. Finding that the government properly withheld the names of the released detainees under FOIA Exemption 7(C), the district court granted DHS's motion for summary judgment.

## II.

The Freedom of Information Act seeks "to ensure an informed citizenry, vital to the functioning of a democratic society." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). To that end, the Act requires that federal agencies make records within their possession promptly available to citizens upon request. *See* 5 U.S.C. § 552(a)(3). Yet this command is not absolute. Rather, Congress recognized that, at times, transparency may come at the cost of legitimate governmental and privacy interests. Thus, the Act provides for nine specific exemptions under which disclosure may be refused. *See* 5 U.S.C. § 552(b). Here, the government relied on Exemptions 6 and 7(C), which state that the following information may be withheld from a FOIA disclosure:

(6): personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(7): records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy.

5 U.S.C. § 552(b). Tuffly does not contest that the records at issue were "compiled for law enforcement purposes," the threshold requirement for Exemption 7(C). Because we affirm on the basis of Exemption 7(C), we need not consider Exemption 6.[5] *See Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1173 (D.C. Cir. 2011). We therefore need determine only whether the disclosure of the released detainees' names could "reasonably be expected to constitute an unwarranted invasion" of their personal privacy.

When a FOIA request implicates the areas of privacy identified by a FOIA exemption, "[t]he statutory direction that the information not be released if the invasion of personal privacy could reasonably be expected to be

---

[5] The "only distinction between the balancing tests applied" in the two exemptions is "the 'magnitude of the public interest' required to override the respective privacy interests they protect." *Forest Serv. Emps. for Envtl. Ethics v. U.S. Forest Serv.*, 524 F.3d 1021, 1025 n.2 (9th Cir. 2008) (quoting *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 496 n.6 (1994)). Thus, cases arising under Exemption 6 may inform our analysis of the private and public interests protected by Exemption 7(C). We apply, however, the balancing test provided for in Exemption 7(C).

unwarranted requires the courts to balance the competing interests in privacy and disclosure." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004). In conducting such balancing, we apply a three-step test. First, we must determine whether the "disclosure implicates a personal privacy interest that is nontrivial or . . . more than [ ] de minimis." *Yonemoto v. Dep't of Veterans Affairs*, 686 F.3d 681, 693 (9th Cir. 2012) (internal citation and quotations omitted), *overruled on other grounds by Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987 (9th Cir. 2016). Second, if such a privacy interest is at stake, the requester "must show that the public interest sought to be advanced is a significant one . . . and that the information is likely to advance that interest." *Favish*, 541 U.S. at 172. Absent a showing of a significant public interest under step two, the invasion of privacy is unwarranted, and the information is properly withheld. *Id*. If both factors are present, however, we must proceed to balancing the two. *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 973 (9th Cir. 2009).

III.

We turn first to identifying the relevant privacy interests. The "concept of personal privacy under Exemption 7(C) is not some limited or 'cramped notion' of that idea." *Favish*, 541 U.S. at 165 (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989)). Instead, the "statutory privacy right protected by Exemption 7(C) goes beyond the common law and the Constitution." *Id*. at 170. Under FOIA, a disclosure implicates privacy interests if it affects "the individual's control of information concerning his or her person," or involves the "disclosure of records containing personal details about private citizens."

*Reporters Comm.*, 489 U.S. at 763, 766. Additionally, "notions of privacy in the FOIA exemption context encompass information already revealed to the public." *Lane v. Dep't of Interior*, 523 F.3d 1128, 1137 (9th Cir. 2008).

In order to demonstrate that the disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the government need not show that such an infringement is certain to occur. Rather, an agency need only show that the requested disclosure "could reasonably be expected" to result in an unwarranted invasion of personal privacy. *Lahr*, 569 F.3d at 977; *see also Forest Serv. Emps.*, 524 F.3d at 1026 (finding a privacy interest when the disclosure "may" have resulted in an invasion of privacy). As the Supreme Court has held, the personal privacy exemptions apply even when the "danger of mistreatment" is "impossible to measure." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 176 (1991).

Under Exemption 7(C), we must consider the privacy interests at stake "in light of the consequences that would follow" from disclosure. *Favish*, 541 U.S. at 170; *see also Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 878 (D.C. Cir. 1989) ("Disclosure does not, literally by itself, constitute a harm; it is the requester's (or another's) reaction to the disclosure that can sting."). "Disclosures that would subject individuals to possible embarrassment, harassment, or the risk of mistreatment constitute nontrivial intrusions into privacy." *Cameranesi v. U.S. Dep't of Def.*, 856 F.3d 626, 638 (9th Cir. 2017); *see also Forest Serv. Emps.*, 524 F.3d at 1026 (finding that there is a cognizable privacy interest under FOIA in avoiding "embarrassment and stigma").

Contrary to the apparent view of Tuffly's counsel, our analysis of the consequences that might follow from disclosure does not turn on the requester's asserted intent in obtaining the information. The Supreme Court has held that "whether an invasion of privacy is warranted cannot turn on the purposes for which the request for information is made." *Reporters Comm.*, 489 U.S. at 771 (emphasis omitted). This is a sensible rule, in light of the fact that under FOIA "once there is disclosure, the information belongs to the general public." *Favish*, 541 U.S. at 174. *See also Painting Indus. of Haw. Mkt. Recovery Fund v. U.S. Dep't of Air Force*, 26 F.3d 1479, 1482 (9th Cir. 1994) ("We must evaluate both the public benefit and the potential invasion of privacy by looking at the nature of the information requested and the uses to which it *could* be put if released to *any* member of the public."); *Horner*, 879 F.2d at 875 (holding that courts cannot "ignore the impact on personal privacy of the more general disclosure that will likely ensue").

Thus, so long as the disclosure of the information would give rise to a potential, nontrivial invasion of personal privacy, there is a privacy interest to be balanced against the public interest under Exemption 7(C).

In this case, disclosing the names of the released detainees would give rise to significant privacy concerns. The disclosure Tuffly seeks would identify the individuals in question as subject to immigration enforcement proceedings and as having been previously detained. The disclosure would also link the former detainees' names with the information already released by the government in the redacted reports, including much personal and private information. Each of these individuals has a privacy interest in this "information concerning his or her person" and these "personal details"

about himself or herself. *Reporters Comm.*, 489 U.S. at 763, 766. We discuss the strength of these privacy interests in further detail below, but they are certainly sufficient to move to the second step of the analysis.

IV.

We must next evaluate the public interest in obtaining disclosure. At this step, the requester bears the burden of showing (1) that the "public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake," and (2) that the information is "likely to advance that interest." *Favish*, 541 U.S. at 172. In determining the significance of the public interest, the relevant inquiry under the "FOIA balancing analysis is the extent to which disclosure of the information sought would she[d] light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *Bibles v. Or. Natural Desert Ass'n*, 519 U.S. 355, 355–56 (1997) (per curiam) (quotations omitted). This inquiry focuses not on the "general public interest in the subject matter of the FOIA request," *Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003), but on the "additional usefulness" of the specific information withheld, *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 978 (9th Cir. 2009).

Tuffly first asserts an interest in understanding ICE's decision-making process in releasing the 149 detainees. However, he is unable to demonstrate that disclosing the names would "add significantly to the already available information concerning the manner in which [the agency] has performed its statutory duties." *Cameranesi*, 856 F.3d at 640 (internal citations omitted). Tuffly has already been provided

with the criminal history (if any) of each of the released detainees. He therefore possesses the relevant information that ICE had before it when it made its decisions to release them.[6]   The purpose of FOIA is to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Schiffer v. F.B.I.*, 78 F.3d 1405, 1410 (9th Cir. 1996) (quoting *Ray*, 502 U.S. at 173).  Here, the veil has been pierced and the light cast upon ICE's release of the 149 non-citizen detainees. The names of the detainees would do nothing to further illuminate the government's decision that these individuals should be released pending completion of their removal proceedings.

Tuffly next asserts an interest in exposing government negligence or misconduct in the decision to release these individuals. However, there is an additional evidentiary showing required when the asserted public interest is demonstrating "that responsible officials acted negligently or otherwise improperly in the performance of their duties." *Favish*, 541 U.S. at 174. In such cases,  the "requester must produce evidence that would warrant a belief by a reasonable person that the alleged government impropriety might have occurred." *Id.* In such cases, "[o]nly when the FOIA requester has produced evidence sufficient to satisfy this standard will there exist a counterweight on the FOIA scale for the court to balance against the cognizable privacy interests in the requested records." *Id*. at 174–75. Tuffly has failed to identify any such evidence. Instead, he relies on conclusory assertions that the names *might* help him uncover evidence of

---

[6] Tuffly does not allege that ICE relied upon any information outside of the records already provided by the government when making the release determinations.

negligence or misconduct. Those assertions are insufficient to satisfy his burden.

Finally, Tuffly asserts an interest in evaluating the *effects* of the government's release decisions, independently of his claims of negligence or misconduct. Unlike Tuffly's other asserted interests, there is a significant enough public interest in examining the success or failure of governmental programs to reach the balancing stage of the analysis. Discovering that a government policy had deleterious consequences can be important information for the public to have, even if those consequences were unforeseeable and the government in no way acted improperly or negligently in adopting the policy. Evidence about the effects of prior policy decisions helps in evaluating the wisdom of future policy proposals, and thus helps "citizens know what their government is up to." *Or. Nat. Desert Ass'n*, 519 U.S. at 356.

Tuffly is not required to present any additional evidence to support an interest in evaluating the effects of the government's policy. As we said in *Cameranesi*, "[i]f the FOIA requester does not allege any government impropriety, the *Favish* reasonable belief standard may be inapplicable." 856 F.3d at 640 n.17 (citing *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 746 F.3d 1082, 1094–95 (D.C. Cir. 2014)). However, this public interest only supports disclosure of the names to the extent that disclosure "is likely to advance" the public's ability to evaluate future government actions. *Favish*, 541 U.S. at 172.

Having found that one of Tuffly's asserted public interests is significant we proceed to balance that interest against the privacy interests identified above.

V.

The privacy interests in this case are particularly strong, both because of the context of immigration enforcement and because of the private information already disclosed by the government that would be linked to the names of the released individuals. On the other side of the scale, the public interest in evaluating the effects of government actions would be advanced only minimally by the information Tuffly seeks. Accordingly, we find that the privacy interests here outweigh the public interest and that nondisclosure is appropriate.

The release of the detainees' names would identify them as being in the country without authorization and as subject to prior ICE detention. The district court was correct that the "often hostile atmosphere surrounding unauthorized immigration" weighs heavily in favor of finding that those detainees may be subjected to harassment, embarrassment, or stigma. There is no question, as the government points out, that undocumented immigrants face a serious risk of "harassment, embarrassment, and even physical violence and reprisal by citizens and law enforcement."[7] Certain local law enforcement agencies have racially profiled and harassed

---

[7] As discussed, we consider the possible consequences of disclosure to any member of the public, not just disclosure to Tuffly. Disclosure under FOIA is disclosure to the general public, not just disclosure to a specific person. Additionally, although Tuffly disavows any intent to contact the detainees, there is no reason to believe that he will not publicize their names. Indeed, his counsel, Judicial Watch, has already published on its website the records released pursuant to Tuffly's FOIA request, and there is no indication that the organization does not plan to similarly publish the released detainees' names. *See* http://www.judicialwatch.org/wp-content/uploads/2015/07/Tuffly-v-DHS-06247-Records-List.pdf.

entire groups of citizens and non-citizens alike in order to identify undocumented immigrants. *See, e.g.*, *Melendres v. Arpaio*, 784 F.3d 1254, 1258 (9th Cir. 2015). One even refused to cease such conduct notwithstanding the orders of the federal court. *See Melendres v. Arpaio*, No. CV-07-2513-PHX-GMS, 2016 WL 2783715, *2 (D. Ariz. May 13, 2016) (Snow, J.) (finding sheriff and other sheriff's office leadership in civil contempt for "multiple acts of misconduct, dishonesty, and bad faith with respect to the Plaintiff class and the protection of its rights" and "persistent disregard for the orders of this Court"); *United States v. Arpaio*, No. CR-16-01012-001-PHX-SRB, 2017 WL 3268180, *7 (D. Ariz. July 31, 2017) (Bolton, J.) (finding sheriff guilty of criminal contempt for "willfully violat[ing] an order of the court"). In addition, the association in voters' minds between day laborers and undocumented immigrants has contributed to laws and local ordinances targeting such laborers. *See, e.g.*, *Valle del Sol Inc. v. Whiting*, 709 F.3d 808, 819 (9th Cir. 2013); *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, __ F.3d __, 2017 WL 3596995, *1 (2d Cir. Aug. 22, 2017). To disclose the identities of the released detainees would be to publicize their immigration status and the fact of their prior detention—a disclosure that could well have a serious impact on the privacy and other rights of the affected individuals.

Moreover, for certain of the detainees, the records already released by ICE include other forms of personal information, including their educational history, race, religion, medical conditions (including psychiatric disorders), and arrest and

conviction records, if any.**8** Thus, granting Tuffly's request could link the detainees with particular, sensitive information, resulting in serious and impermissible invasions of their privacy. *See Ray*, 502 U.S. at 176 ("Although disclosure of such personal information constitutes only a *de minimis* invasion of privacy when the identities of the [individuals] are unknown, the invasion of privacy becomes significant when the personal information is linked to particular [individuals].").

On the other side of the scale is the public interest in evaluating the effects of the government's release decisions to inform similar public policy decisions in the future. While that interest is significant in the abstract, here the information Tuffly seeks would only minimally advance public understanding of the government's actions.

There is nothing special about the 149 detainees addressed by Tuffly's FOIA request. These individuals are not, as he claims, "criminal aliens" or "dangerous individuals." Rather, the records released by the government reveal that 53% of the former detainees have no criminal convictions at all. Of those with any criminal convictions, 87% were for minor offenses, such as traffic offenses, shoplifting, and disorderly conduct. Only 7% of the 149 released detainees were convicted of more serious

---

**8**    *See, e.g.*, http://www.judicialwatch.org/wp-content/uploads/2015/07/Tuffly-v-DHS-06247-Records-r_2015-ICFO-06247.pdf at 47, 64, 88, 134 (educational history); *id.* at 103 (race); *id.* at 356 (religion); *id.* at 128, 134, 244, 365 (medical conditions).

offenses such as assault, battery, and weapons offenses.[9] None had been convicted, as some would have us believe, of crimes such as murder, rape, or kidnapping. Thus, the large majority of the released detainees are not criminals in the ordinary sense of the word, and only a small number could conceivably be described as "dangerous" even under the most expansive use of that term. Indeed, the rate of criminal convictions is *lower* among the released detainees than among adult Americans in general, and the crimes previously committed by the few with a prior record are far less serious. This is confirmed by a recent Cato Institute study, which found that, excluding immigration offenses, native-born Americans are more than three times as likely to be incarcerated as undocumented immigrants.[10] Tuffly's willingness to label as dangerous criminal aliens people who have never even been charged with a crime, people who have been charged but not convicted, and people who have been convicted only of traffic offenses or other minor crimes vividly illustrates the risks to these individuals' privacy if their names are disclosed.

---

[9] *See* http://www.judicialwatch.org/document-archive/tuffly-v-dhs-06247-records-list/. The calculation of "more serious offenses" includes convictions for domestic violence, assault, battery, intimidation, weapons offenses, firing a weapon, and robbery.

[10] *See, e.g.*, Cato Institute, *Criminal Immigrants: Their Numbers, Demographics, and Countries of Origin* 2 (Mar. 15, 2017), available at https://object.cato.org/sites/cato.org/files/pubs/pdf/immigration_brief-1.pdf. Despite the evidence showing that undocumented immigrants are less likely to commit crimes than citizens, the government has recently opened a new office dedicated to crimes allegedly committed by undocumented immigrants. *See* U.S. Immigrations and Customs Enforcement, Victims of Immigration Crime Engagement (VOICE) Office, https://www.ice.gov/voice.

The released detainees are more properly understood as merely some of the approximately 400,000 undocumented immigrants who are held in ICE detention every year.[11] Of those detainees, about one-third are granted bond by an Immigration Judge pursuant to the governing statutes.[12] The vast majority of these individuals post bond and are released. There is no reason to think that ICE's release decisions in the cases involved in this FOIA request are any different from the hundreds of thousands of other similar decisions ICE makes each year—decisions to release individuals who are less likely to commit serious crimes than are citizens of this country.

The public interest in evaluating the effects of the government's immigration detention and release policies is barely advanced by picking out a small subset of individuals who are released from detention and tracking down information about their post-release conduct in an ad hoc manner. Tuffly admits that release of the names would not itself advance the public interest in understanding the impact of the government's detention and release policies. Rather, Tuffly would have to use the names to search through various

---

[11] *See* Dr. Dora Schriro, Immigration and Customs Enforcement, *Immigration Detention Overview and Recommendations* at 6 (Oct. 6, 2009), available at https://www.ice.gov/doclib/about/offices/odpp/pdf/ice-detention-rpt.pdf.

[12] *See* Syracuse University, TRAC Immigration, *What Happens When Individuals Are Released on Bond in Immigration Court Proceedings* (Sept. 14, 2016), available at http://trac.syr.edu/immigration/reports/438/. Moreover, nearly one-third of American adults have a criminal history, and at least 4 million have been released on supervision, probation, or parole. Bureau of Justice Statistics, *Probation and Parole in the United States, 2015*, available at https://www.bjs.gov/content/pub/pdf/ppus15_sum.pdf.

databases (including the individual databases of assorted local law enforcement agencies) and comb the internet for references to the released individuals. This task is far from certain to produce any relevant information regarding the detainees' acts after release. Even if such information were found, Tuffly would still need to connect such acts to the government's detention and supervision decisions. Such an approach does not lend itself to sound conclusions about the impact of governmental policy. *See Ray*, 502 U.S. at 179 (holding that "[m]ere speculation about hypothetical public benefits cannot outweigh a demonstrably significant invasion of privacy"); *Associated Press v. U.S. Dep't of Def.*, 554 F.3d 274, 289–90 (2d Cir. 2009) (holding that the "speculative nature" of the public interest was "insufficient to outweigh the detainees' privacy interest in nondisclosure").[13]

## VI.

This case requires us to balance the privacy interests of non-citizens formerly held in ICE detention with the public's right to access government records. Here, disclosing the names of the released detainees risks subjecting them to

---

[13] The case on which Tuffly primarily relies, *Union Leader Corp. v. U.S. Dep't of Homeland Sec.*, 749 F.3d 45 (1st Cir. 2014), involved a balancing of different privacy and public interests than are at stake here. The only privacy interests discussed in *Union Leader* were the individuals' privacy interests in the fact of their prior arrests and convictions, *id.* at 51, while here the disclosure Tuffly seeks would link the individuals' names to substantial amounts of private information, including medical and psychiatric conditions, that are not a matter of public record. While all of the individuals in *Union Leader* had criminal records, here only a minority of the released detainees have any convictions at all. Finally, the plaintiffs in *Union Leader* presented specific evidence of government misconduct or neglect, *id.* at 56, which Tuffly has been unable to do here.

significant invasions of personal privacy. The detainees would be publicly identified as unauthorized immigrants who had previously been held in government detention, a status which carries with it the potential for stigma, harassment, discrimination, illegal detention, and even violence. In addition, the detainees' names would be linked to other personal and potentially embarrassing information that has already been disclosed but not identified as applying to them. This invasion of personal privacy is not, in this case or in this era, outweighed by the public interest. Thus, we affirm the decision of the district court.

**AFFIRMED.**